# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON JABARA,

      Plaintiff,

v.                               3:13-CV-02041
                                    (JUDGE MARIANI)

AETNA LIFE INSURANCE CO.,

      Defendant.

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court are cross-motions for summary judgment filed by Plaintiff Jason Jabara (Doc. 35) and by Defendant Aetna Life Insurance Company ("Aetna") (Doc. 33). Plaintiff filed this action under Section 1132(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, seeking reinstatement of long-term disability benefits. (Compl., Doc.1, at ¶4). By Memorandum (Doc. 31) and Order (Doc. 32) dated December 1, 2014, this Court has previously determined that the arbitrary and capricious standard of review applies to Plaintiff's claims that Defendant improperly terminated his long-term disability benefits and improperly denied reinstatement of those benefits.

At the outset, the Court will dispense with Plaintiff's Cross Motion for Summary Judgment (Doc. 35). Because Plaintiff failed to follow the Middle District of Pennsylvania Local Rules that govern the filing of this Motion and its supporting documents, Plaintiff's

1

Motion is hereby deemed withdrawn. Under Local Rule 7.5, Plaintiff had fourteen days after the filing of his motion in which to file a brief in support of said Motion. The Rule states that, "[i]f a supporting brief is not filed within the time provided in this rule the motion shall be deemed to be withdrawn." Plaintiff filed his Motion on February 3, 2015. On March 6, 2015, more than 30 days after the Motion was filed, Plaintiff a filed a document styled "Brief in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment" (Doc. 38). To the extent that this document constitutes an opposition brief to Defendant's Motion for Summary Judgment, it was timely under Local Rule 7.6. Combining a Brief in Support with a Brief in Opposition, however, does not allow Plaintiff to escape the bounds of Local Rule 7.5, to wit: the requirement that a supporting brief must be filed within fourteen days of the filing of the relevant Motion. Thus, the Court will deem Plaintiff's Cross Motion for Summary Judgment withdrawn.[1] Nevertheless, the Court of necessity must consider the merits of Plaintiff's claim of entitlement to benefits in resolving Defendant's Motion for Summary Judgment and will also do so to avoid any injustice to the Plaintiff which might otherwise ensue from his Counsel's failure to comply with the rules of this Court.

---

[1] Furthermore, Plaintiff failed to follow Local Rule 56.1, which provides that "[a] motion for summary judgment . . . shall be accompanied by a separate, short and concise statement of the material facts." Plaintiff filed no such statement with his Cross Motion for Summary Judgment (Doc. 35), and, indeed, never filed such a statement. Plaintiff filed only a Response to Defendant's Statement of Facts (Doc. 37).

2

## II. STATEMENT OF MATERIAL FACTS

Before relating the undisputed, material facts of this case, the Court is compelled by the state of the filings it received on this point to remark on what it expects of the parties – and indeed, what the Federal and Local Rules require of them – at the summary judgment stage of proceedings. Local Rule 56.1, "Motions for Summary Judgment," reads as follows:

> A motion for summary judgment filed pursuant to Fed.R.Civ.P.56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.
>
> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.
>
> Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.
>
> All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

"The purpose of this rule is to 'structure a party's summary judgment legal and factual theory into a format that permits and facilitates the court's direct and accurate consideration of the motion.'" *Hartshorn v. Throop Borough*, No. 3:07-CV-01333, 2009 WL 761270, at *3 (M.D. Pa. Mar. 19, 2009) (quoting *Gantt v. Absolute Machine Tools, Inc.*, No. 1:06–CV–1354, 2007 WL 2908254, at *3 (M.D. Pa. Oct. 4, 2007). Here, neither party has presented the Court with Local Rule 56.1 papers that facilitate the Court's consideration of Defendant's

Motion for Summary Judgment. With respect to the moving party, the Defendant, the Court wishes to make clear that in a statement of facts for a motion for summary judgment where the arbitrary and capricious standard is to be applied, it does not expect to see again paraphrases, summaries, characterizations, or interpretations where the reports are available and may be quoted verbatim. And with respect to the nonmoving party, the Court notes that the Plaintiff went to great lengths to avoid admitting or denying the specific assertions of fact made by Defendant and engaged in many of the same approaches of Defendant, to wit, providing characterizations and interpretations of medical reports rather than providing the text itself. Plaintiff avoided admitting and denying factual assertions apparently in an effort to avoid admitting material facts harmful to his position, something that is absolutely impermissible in responding to a Local Rule 56.1 Statement of Material Facts and which represents a singular abuse of the summary judgment process.

The following represents the undisputed material facts that the Court sifted from the parties' papers:

Plaintiff was hired by Defense Support Services, LLC as an electrician on January 1, 2010. (SMF, Doc. 34 at ¶1; Response to SMF, Doc. 37 at ¶1). His position "often required extremely heavy lifting," though it was at some point post-hire classified as a medium physical demand occupation. *Id.* Plaintiff was an eligible participant in Defense Support Services, LLC's employee welfare benefit plan ("Plan"), which offered long-term disability ("LTD") benefits. *Id.* at ¶2. The Plan was subject to ERISA. *Id.* Defendant was the

4

underwriter of the Plan and administered LTD claims under it. *Id.* at ¶¶3-4. Defendant is a fiduciary pursuant to Section 503 of ERISA. *Id.* at ¶5. The Plan documents provide that Defendant has "complete authority to review all denied claims for benefits under this policy" and has "discretionary authority to determine whether and to what extent employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms of this Policy, the Certificate, or any other document incorporated herein."[2] (Doc. 37 at ¶6). The Plan documents provide that the test for disability changes after the first twenty-four months in which LTD benefits are received. (Doc. 34 at ¶8; Doc. 37 at ¶8). During the first twenty-four months, disability requires "an inability to perform the material duties of [one]'s own occupation;" after that period, disability requires "the inability to work at any reasonable occupation." *Id.*

Plaintiff's last day of work with Defense Support Services, LLC was August 5, 2010 due to back problems described as a "diagnosis of displacement of lumbar intervertebral disc without myelopathy and a herniated disc." *Id.* at ¶9. Defendant initially approved Plaintiff's LTD benefits claim on March 29, 2011.[3] (Doc. 34 at ¶10). At the time of the initial

---

[2] Plaintiff contends that SMF ¶6 "avers legal conclusions." (Doc. 37 at ¶6). But a review of the record citation provided by Defendant confirms the most obvious reading of SMF ¶6: that Defendant has quoted specific portions of the Plan documents. (*See* Benefit Plan, Doc. 34, Ex. 1 at 74). Thus, SMF ¶6 is a factual assertion. The Court deems SMF ¶6 as admitted due to the unresponsive nature of Plaintiff's answer.

[3] Despite devoting more than two pages of his "Response" to SMF ¶10, Plaintiff fails to address the basic factual assertion made by Defendant in SMF ¶10; to wit, the date on which Defendant initially approved Plaintiff's claim for LTD benefits. The Court deems the basic fact that Defendant initially approved Plaintiff's LTD benefits on March 29, 2011 as admitted due to the unresponsive nature of Plaintiff's answer.

approval, Defendant possessed the following records from Plaintiff's doctor, Dr. Butcofski: two Attending Physician Statements, one dated December 2010 and one dated March 28, 2011, and a Capabilities and Limitations Worksheet dated March 28, 2011. (Doc. 34 at ¶10; Doc. 37 at ¶10). These records indicated no ability to work. *Id.* In March and April 2011, Defendant received additional records from Dr. Albert Janerich and Dr. John Cantando. *Id.* at ¶11. On December 9, 2011, Defendant received additional records from Dr. Butcofski relating to office visits in June and December 2011. *Id.* at ¶12. Defendant did not receive any further records until November 21, 2012 when it received records from Dr. Victor Roberts.[4] (Doc. 34 at ¶13). An MRI was performed on Plaintiff on December 5, 2012. (Doc. 34 at ¶15; Doc. 37 at ¶15). The results were received by Defendant on December 13, 2012.[5] (Doc. 34 at ¶15).

On November 29, 2012, Defendant sent a letter to Dr. Roberts requesting release of Plaintiff to sedentary activity with the ability to change from sitting to standing and walking as needed. (Doc. 34 at ¶14; Doc. 37 at ¶14). Dr. Roberts signed the letter on January 8, 2013 and returned it to Defendant.[6] *Id.* at ¶16. After receipt of the signed letter, Defendant performed a "transferrable skills analysis / labor market analysis," which "determined that

---

[4] Plaintiff does not specify whether he admits or denies SMF ¶13; instead, he provides a narrative description of his visit with Dr. Roberts and a citation to the administrative record as submitted by Defendant. (Doc. 37 at ¶13). Thus, by failure to respond and by implication, the Court deems as admitted that Defendant received records from Dr. Roberts on November 21, 2012.

[5] Again, Plaintiff does not specify whether he admits or denies SMF ¶15. (Doc. 37 at ¶15). The Court deems admitted the date of Defendant's receipt of the MRI results as specified in SMF ¶15.

[6] Though Plaintiff responses that SMF ¶16 is "[d]enied as stated," (Doc. 37 at ¶16), he also responds as follows: "[t]hat Dr. Roberts signed the 1-8-2013 letter appears to be true." *Id.* Thus, the Court deems admitted the fact that Dr. Roberts signed and returned the letter.

6

there were multiple jobs consistent with Plaintiff's transferable skills and restrictions and limitations" and that exceeded Plaintiff's target hourly wage.[7] (Doc. 34 at ¶17). Plaintiff's LTD benefits were terminated as of January 25, 2013. (Doc. 34 at ¶¶7, 18; Doc. 37 at ¶¶7, 18).

On February 11, 2013, after receipt of the termination letter, Plaintiff submitted to Defendant a report from Dr. Janerich.[8] *Id.* at ¶19. Dr. Janerich did not review the MRI performed on December 5, 2012.[9] *Id.* at ¶20. Dr. Janerich stated that his office had "been involved in the care and treatment of [Plaintiff] since November 6, 2008." *Id.* at ¶21. The medical records that Defendant has from Dr. Janerich's office stop in June 2009; when Defendant contacted the office in April 2011 seeking more recent records, Defendant was informed that Plaintiff was last seen by the office in 2009.[10] (Doc. 34 at ¶21). Dr. Janerich's report asserts for the first time in the history of Plaintiff's claim with Defendant that Plaintiff

---

[7] Plaintiff denies SMF ¶17 as stated, but fails to respond to the factual assertions made by Defendant. (Doc. 37 at ¶17). Thus, the Court deems as admitted Defendant's assertions that it conducted the above-mentioned analysis as well as Defendant's representation of the results.

[8] Plaintiff does not specify whether he admits or denies the date that the letter was provided to Defendant as it is represented in SMF ¶19. The Court deems as admitted the date offered by Defendant.

[9] While Plaintiff denies SMF ¶20 as stated, Plaintiff's answer is, in actuality, a wide-ranging, nearly three and a half page summary of Dr. Janerich's report, very little of which is responsive to SMF ¶20. In the course of those nearly three and a half pages, Plaintiff does admit that Dr. Janerich did not review the December 5, 2012 MRI.

[10] Plaintiff denies SMF ¶21 as stated, saying only that, "[t]o the contrary, Dr. Janerich was involved in the care and treatment of Jason at various time [sic] since 11-6-2008." (Doc. 37 at ¶21). Plaintiff does not provide a citation to record evidence. The Court does not consider this a proper response to or denial of the factual assertions in SMF ¶21 and deems the factual assertions in SMF ¶21 admitted, as laid out in the body of this opinion.

suffered from pain in the cervical spine and a twitch in the right triceps brachii.[11] (Doc. 34 at ¶23). Dr. Janerich supported his conclusion about Plaintiff's cervical spine condition with reference to MRI conducted in 2008. (Doc. 34 at ¶24; Doc. 37 at ¶24).

After Defendant received Dr. Janerich's letter, an Aetna nurse reviewed it. (Doc. 34 at ¶25). Defendant then issued a letter to Plaintiff stating that, notwithstanding Dr. Janerich's letter, the termination decision had not changed.[12] *Id.* Plaintiff filed another appeal, requested a copy of his claim file, and provided no further medical information.[13] *Id.* at ¶26. Plaintiff's Counsel submitted a letter to Defendant that discussed diagnostic testing from 2008 and 2010, but which did not discuss the MRI performed in December 2012. (Doc. 34 at ¶27; Doc. 37 at ¶27). Plaintiff's Counsel submitted a second letter on March 14, 2013. *Id.* at ¶28. Counsel's letter asserted that the letter Defendant had previously sent to Dr. Roberts presented information inconsistent with Plaintiff's records and condition. *Id.* Though Counsel's letter also stated that Plaintiff suffered adverse effects from his medication, the letter did not cite medical records that supported that assertion, nor did

---

[11] While Plaintiff denies SMF ¶23 as stated, he "admits" that Plaintiff suffers from cervical pain and a twitch in his right triceps. (Doc. 37 at ¶23). Plaintiff provides no record citations and fails to respond to Defendant's assertion that Dr. Janerich's report is the first time in the history *of the claim* that such ailments were mentioned, and thus the Court deems SMF ¶23 admitted.

[12] Plaintiff does not specify whether he admits or denies SMF ¶25. (Doc. 37 at ¶25). The Court deems SMF ¶25 admitted because Plaintiff's answer is unresponsive to the specific factual assertions contained in SMF ¶25; to wit, that Defendant reviewed Dr. Janerich's contribution to the claim record and then issued a letter to Plaintiff stating that its termination decision remained unchanged.

[13] Plaintiff does not specify whether he admits or denies SMF ¶26. (Doc. 37 at ¶26). The Court deems it admitted because Plaintiff's answer is unresponsive to the specific factual assertions contained in SMF ¶26.

8

Counsel provide updated records in support of it.[14] *Id.* at ¶30. Defendant became aware of the denial of Plaintiff's appeal for Social Security Disability benefits on April 3, 2013. *Id.* at ¶31.

Defendant referred Plaintiff's appeal file out to board certified physicians for independent medical reviews and peer-to-peer consultations.[15] *Id.* at ¶32. Dr. Vaughn Cohan conducted an independent review in neurology and found that Plaintiff was capable of light work and that the limitations imposed by Dr. Janerich were not supported by the documentation provided.[16] (Doc. 34 at ¶33). Dr. Stuart Rubin also conducted an independent review in physical medicine and rehabilitation. (Doc. 34 at ¶38; Doc. 37 at ¶38). Dr. Rubin attempted a peer-to-peer consultation with Dr. Janerich was not successful.[17] (Doc. 34 at ¶39). Dr. Rubin opined that Plaintiff could perform sedentary

---

[14] Though Plaintiff's response to SMF ¶30 begins with the word "Admitted," it is frankly unclear whether Plaintiff intended to admit the specific factual assertions about his Counsel's letter made by Defendant or whether he intended to admit only the unresponsive text of his answer. (Doc. 37 at ¶30). Nonetheless, the Court will deem SMF ¶30 admitted due to the unresponsive nature of Plaintiff's answer.

[15] Plaintiff's response to SMF ¶32, in its entirety, is as follows: "[t]his may be true." (Doc. 37 at ¶32). The Court deems this to be an admission of Defendant's statement.

[16] Plaintiff's response to SMF ¶33, in its entirety, is as follows: "Dr. Vaughn Cohan a neurologist [*sic*] never examined Jason." (Doc. 37 at ¶33). The Court deems SMF ¶33 admitted due to Plaintiff's unresponsive answer. The Court notes that this is an example of a factual assertion where Defendant could have greatly aided the Court's direct and accurate consideration of Defendant's Motion but failed to do so. The Court has reviewed Dr. Cohan's report on the claim file, as cited to by Defendant, (*see* Doc. 34, Ex. 5 at 46-51), and has found that Dr. Cohan states, in relevant part, the following: "it is my opinion, based on review of the medical records provided, that [Plaintiff] would be capable of performing up to and including a light physical demand level (at least)," (*id.* at 50); and "[i]t is my opinion that the restrictions and limitations imposed by Dr. Janerich are not supported by the documentation provided," (*id.* at 51). Presenting these verbatim quotations in SMF ¶33 would have required Plaintiff to admit or deny that the report contained such statements, though, by way of further answer, the Plaintiff would have remained free to interpret these statements differently than did Defendant.

[17] Plaintiff's response to SMF ¶39, in its entirety, is as follows: "[s]ee 38 above. Dr. Rubin never contacted or indicated to Jason or his counsel any request to schedule a peer to peer review." (Doc. 37 at

work. *Id.* On May 20, 2013, Defendant provided a copy of Dr. Rubin's report to Dr. Janerich and requested a response; no response was ever provided.[18] (Doc. 34 at ¶40; Doc. 37 at ¶40).

By May 24, 2013, Defendant concluded its appellate review of its decision to terminate benefits; the decision was upheld. *Id.* at ¶41. Defendant addressed a termination letter to Plaintiff's counsel. *Id.* at ¶42.

### III. STANDARD

#### A. Standard of Review for Motions for Summary Judgment

Through summary adjudication, the Court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

¶39). This is not a proper form of response to Defendant's statement and due to the unresponsive nature of Plaintiff's answers, whether to SMF ¶38 or ¶39, the Court deems Plaintiff to have admitted the factual assertions that Dr. Rubin unsuccessfully attempted to conduct a peer-to-peer consultation with Dr. Janerich and that he opined that Plaintiff could perform sedentary work. Given Plaintiff's repeated failures to properly respond to Defendant's Statement of Material Facts and the illustrative nature of this particular response, the Court will dwell on it for a moment more. Plaintiff's Counsel should be made aware that an attorney's repeated, egregiously unresponsive answers have the consequence of undermining that attorney's credibility with a court. Here, where Defendant asserts that "Dr. Rubin attempted a peer to peer contact with Dr. Janerich but was not successful," (Doc. 34 at ¶39), where Defendant's record citation, unspecific as it may be, indicates under the heading of "Peer-to-Peer Consultation" that Dr. Rubin left three messages at Dr. Janerich's office, (Doc. 34, Ex. 5 at 58), and where Plaintiff responds with "Dr. Rubin never contacted or indicated to Jason or his counsel any request to schedule a peer to peer review," that response is not logically related to the original factual assertion.

[18] Plaintiff's response to SMF ¶40, in its entirety, is as follows: "[m]aybe true." (Doc. 37 at ¶40). The Court deems this to be an admission of Defendant's statement.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

### B. Standard of Review of Plan Administrator's Denial of ERISA Benefits

By Memorandum (Doc. 31) and Order (Doc. 32) dated December 1, 2014, this Court has previously determined that the arbitrary and capricious standard of review – rather than

a *de novo* standard – applies to Plaintiff's claims that Defendant improperly terminated his long-term disability benefits and improperly denied reinstatement of those benefits. A decision is arbitrary and capricious if "it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012). Under the arbitrary and capricious standard, "[c]ourts defer to an administrator's findings of facts when they are supported by 'substantial evidence,' which [is] 'defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Fleisher*, 679 F.3d at 121 (citation omitted). "The scope of this review is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.'" *Doroshaw v. Hartford Life & Accident Co.*, 574 F.3d 230, 234 (3d Cir. 2009) (quoting *Abnathya v. Hoffman-La Roche [Hoffmann], Inc.*, 2 F.3d 40, 45 (3d Cir. 1993), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008)). Defendant's decisions, then, will be upheld unless they are "clearly not supported by the evidence in the record." *Michaels v. Equitable Life Assur. Soc'y*, 305 Fed. App'x. 896, 901 (3d Cir. 2009) (citing *Smathers v. Multi-Tool, Inc.*, 298 F.3d 191, 199–200 (3d Cir. 2002)). That is, so long as there were reasonable bases for Defendant's decisions, a reviewing court will not disturb those decisions. *Id.*

## IV. ANALYSIS

Plaintiff challenges Defendant's decisions to terminate his LTD benefits and to uphold that termination on administrative appeal, arguing that Defendant "abuse[d] its

discretion in denying and then in failing to reinstate Plaintiff's LTD benefits." (Brief in Opposition, Doc. 38 at 6). Review of the administrative record[19] before Defendant at both the initial termination and the appeal stages, however, compels this Court to find in favor of Defendant. This is not a close case where Defendant's actions can be scrutinized based on the existence of conflicting, competent evidence contained in the record. Instead, the Court's decision is dictated by the evidence in the record relevant to Plaintiff's status in early 2013, at the time of the disability "test change." That evidence supports a finding that Plaintiff is capable of sedentary work, a finding that is unchallenged by anything submitted by Plaintiff for the period at which the test for disability was no longer the ability to perform one's "own occupation," but rather ability to work at "any reasonable occupation."[20]

In evaluating Plaintiff's claim that Defendant's actions at termination and on administrative appeal were arbitrary and capricious, the Court is mindful that the Plan itself put the burden of proving disability on the Plaintiff at both of those points. (*See* Benefit Plan, Doc. 34, Ex. 1, at 10) (listing "the date you fail to provide proof that you meet the LTD test of disability" as one of several points at which a Plan participant will "no longer be

---

[19] The Court considers the administrative record to consist solely of the documents submitted by Defendant as exhibits to its Statement of Facts (Doc. 34). Plaintiff has neither offered his own documents at the summary judgment stage, nor challenged the accuracy or completeness of Defendants' exhibits with respect to their ability to represent the record as it was when Defendant made its decisions to terminate Plaintiff's LTD benefits and to uphold that termination on administrative appeal.

[20] The Plan under which Plaintiff's LTD benefits were administered provides that "[a]fter the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any reasonable occupation solely because of an illness, injury or disabling pregnancy-related condition." (Doc. 34, Ex. 1, at 9). "Reasonable occupation" is defined by the Plan documents as "any gainful activity" "[f]or which you are, or may reasonably become, fitted by education, training or experience; and [w]hich results in, or can be expected to result in, an income of more than 60% of your adjusted predisability earnings." *Id.* at 27.

considered as disabled nor eligible for long term monthly benefits."). Thus, at the "test change" period, when Plaintiff's disability status was measured against not his "own occupation" as an electrician, but rather against "any reasonable occupation," Plaintiff was required to demonstrate to Defendant that Plaintiff's condition under the new test continued to warrant the payment of benefits. This fact is unremarkable in the context of the insurance industry. *See, e.g., Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 439 (3d Cir. 1997) ("LTD benefits under the [Kodak] Plan are not automatic, and a claimant bears the burden of demonstrating that he qualifies for benefits."), *abrogated on other grounds as stated in Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 847 (3d Cir. 2011).

The Court's careful review of the administrative record indicates that Plaintiff provided very little information to Defendant about the time period relevant to its decisions. Much of the information with which Plaintiff came forward was outdated information drawn from or submitted in conjunction with the initial twenty-four month period of LTD benefits, which was measured by the "own occupation" test for disability. For instance, Dr. Janerich's letter to Plaintiff's Counsel dated February 1, 2013, recounted five visits by Plaintiff to Dr. Janerich's office, all occurring on or before June 25, 2009 – that is, over a year before Plaintiff's last day of work. (Doc. 34, Ex. 6 at 12-14). In the section of the letter discussing Plaintiff's January 23, 2013 visit, the objective medical tests referenced by Dr. Janerich, namely electromyograms (EMG), nerve conduction studies (NCV), and MRIs, were performed in 2009 and in 2010. *Id.* at 14-15. Dr. Janerich did not review Plaintiff's more

recent December 5, 2012 MRI, and though Dr. Janerich recommended a new "EMG/NCV of the upper and lower extremities" be done, *id.* at 15-16, there is no indication of the results in the administrative record, if indeed such a study was ever conducted.

Similarly, Plaintiff's arguments before this Court rely heavily on outdated medical records related the "own occupation" period of LTD benefits. For instance, Plaintiff claims that one of Defendant's independent medical reviewers, Dr. Cohan, "erroneously set[] aside Dr. Janerich's restriction because of [Plaintiff]'s medication therapy contending there is no evidence of impairment from the medications written in the records." (Doc. 38 at 20). Plaintiff goes on to state that "[t]his is simply untrue, as discussed above, Dr. Butcofski[] . . . specifically noted the medication therapy made [Plaintiff] sleepy." *Id.* Plaintiff provides no record citation to Dr. Butcofski's note, but the Court has discerned that on Dr. Butcofski's Attending Physician Statement dated March 28, 2011, the word "sleepy" is written on the line next to "[i]mpairment from medication effects." (Doc. 34, Ex. 5 at 90-91). But Dr. Cohan was asked by Defendant if there were "any physical or cognitive examination findings of any functional impairment suggesting that the claimant's ability to work has been directly impacted by an adverse medication effect during the time period from 02/02/2013 through 05/31/2013." (Doc. 34, Ex. 5 at 51). Plaintiff's suggestion that a single report of a subjective complaint documented nearly two years before the "test change" is enough to render Dr. Cohan's response that "[t]here is no evidence in the medical record to indicate that the claimant's work functionality has been adversely affected by medications," *id.*,

15

"erroneous" given the question asked of him smacks of a lack of understanding of the standards involved in this case.

The Court's review of the administrative record convinces it that Plaintiff failed to meet his burden of demonstrating disability under the "any reasonable occupation" standard, and thus, that Defendant did not act in an arbitrary and capricious nature in its handling of Plaintiff's claim. Indeed, the record also reveals that Defendant made the effort to extract from Plaintiff and his doctors, specifically Dr. Roberts and Dr. Janerich, information that might potentially have supported his claim under the "any reasonable occupation" standard and his appeal of the termination of LTD benefits. The information requested was simply never provided. For instance, Dr. Rubin, one of Defendant's independent medical consultants, attempted to reach Dr. Janerich by telephone several times in the course of conducting his review of the claim file. (Doc. 34, Ex. 5 at 58). According to the record, Dr. Janerich never responded to Dr. Rubin's calls. Furthermore, on May 20, 2013, a Senior Appeal Specialist employed by Defendant sent a letter to Dr. Janerich asking him to review Dr. Rubin's report and requesting that, if he disagreed with the report's conclusion, he "respond by indicating which areas of the attached report [he] agree[s] with, which areas [he] disagree[s] with, and any clinical evidence or observations in support of that opinion that have not already been provided . . . ." (Doc. 34, Ex. 5 at 55). It is undisupted that Dr. Janerich never responded. *See supra,* at 9-10. And in the narrative letter that Dr. Janerich did provide Defendant on appeal, he makes reference to diagnostic

studies that do not appear in the record that was before Defendant at the time. Indeed, Defendant made efforts to obtain these medical records at the *beginning* of Plaintiff's award of LTD benefits, well before the test change. (*See* Doc. 34, Ex. 2 at 28-29 (March 2011 claim note expressing desire to obtain copy of an MRI referenced by Dr. Janerich)); (Doc. 34, Ex. 2 at 44 (claim note documenting ParaMeds' repeated attempts in April 2011 to obtain records from Dr. Janerich)).

With respect to Dr. Roberts, Defendant sent him a letter dated November 29, 2012 (Doc. 34, Ex. 4, at 100) asking Dr. Roberts to sign and return the letter if he agreed with the assessment that Plaintiff had "full time sedentary functional capacity," as defined in the letter. *Id.* The letter directed Dr. Roberts to provide his "clinical rationale with test results and any other evidence that would help [Defendant] understand what would prevent [Plaintiff]'s level of full time functional capacity" if he did not agree with the assessment. *Id.* The letter additionally asked Dr. Roberts if there were "any other tests that [he felt] would be helpful in assessing [Plaintiff]'s current functional status" and provided a fax number to which Dr. Roberts could send his response. *Id.* Instead of providing information that may have altered Defendant's assessment that Plaintiff had sedentary work capacity, Dr. Roberts responded with a signed copy of the letter by fax on January 8, 2013. (Doc. 34, Ex. 6 at 4).

These above vignettes are representative of the administrative record's overall inability to prove the claims Plaintiff has placed before this Court. The upshot of this case is

that there is substantial evidence in the record to support Defendant's actions. Plaintiff's scattershot approach to this lawsuit, which has included avoidance of his obligations under Local Rule 56.1, see supra, at 2-4, mischaracterizing a rather straightforward document,[21] and dredging up the most inconsequential of details from Plaintiff's medical history, does not and cannot call into question the material facts of this case. Despite Plaintiff's burden to prove disability, Plaintiff provided Defendant with very little evidence to go on when making its decision to continue or to terminate LTD benefits.[22] Plaintiff provided Defendant with

---

[21] According to Plaintiff the letter signed by Dr. Roberts and returned to Defendant on January 8, 2013 (Doc. Doc. 34, Ex. 6 at 4) "is ambiguous in what was being asked of the doctor. The letter is not a clear or unequivocal opinion of ability to perform sedentary work." (Doc. 38 at 16). Relying only on the Plaintiff's sometimes incoherent account of the letter, one would be led to believe that Defendant tricked Dr. Roberts into agreeing that Plaintiff had sedentary work capacity because, and only because, such a release was necessary in order for Dr. Roberts' patient to receive the benefit of rehabilitation services. Plaintiff would have the reader of his Brief in Opposition to Defendant's Motion for Summary Judgment believe that Defendant then turned around and used this release for the completely unrelated purpose of denying Plaintiff LTD benefits. The Court has reviewed the letter and finds that this is not at all what the contents of the letter represent. The Defendant's nurse consultant who authored the letter makes clear that "[i]n order [for the nurse consultant] to properly evaluate [Plaintiff]'s continue eligibility for LTD benefits, additional information is needed from [Dr. Roberts'] office." (Doc 34, Ex. 4 at 100). The nurse consultant writes that he is "unclear why [Plaintiff] would be incapable of full time sedentary activity" and "ask[s] for [Dr. Roberts'] assistance in determining [Plaintiff]'s current level of function to be sure [the nurse consultant is] considering all of the medical data in making an assessment of functional capacity." Id. The letter also states that the Policy requires that Plaintiff's "ability to work at occupations other than prior work will be considered." Plaintiff's characterization of this letter is untenable. Furthermore, as discussed, supra at 17, the letter presented Dr. Roberts with the option to disagree with the nurse consultant's assessment, an option he simply did not choose to exercise, whether affirmatively or through a lack of response.

[22] In the records from Plaintiff's October 23, 2012 visit to Dr. Roberts' office, Dr. Roberts wrote that "[i]n [his] medical opinion [Plaintiff] is unable to manatain [sic] a full time employment until further evaluation and treatment by a interventional Pain management or a neurosurgery consultation." (Doc. 34, Ex. 6 at 3). This statement was effectively nullified when Dr. Roberts signed and returned Defendant's Letter on January 8, 2013, soon before the "test change." In that letter, Defendant's nurse consultant conveyed to Dr. Roberts his assessment that "based on the current medical records in the file, that [Plaintiff] would have full time sedentary functional capacity." The letter requested that "[i]f [Dr. Roberts] [was] in agreement with this assessment" he "sign and date below." Dr. Roberts "sign[ed] and date[d] below." (See Doc. 34, Ex. 6 at 4). Thus, at the point of termination, Plaintiff had provided Defendant with no opinion from a medical provider that he was unable to work at any reasonable occupation at the "test change." To the extent that

very little evidence to go on when making its decision to uphold that termination.[23]

Defendant took that evidence, scant as it was, and forwarded it, along with other medical records in the claim file,[24] to two independent medical reviewers. These medical reviewers

---

Plaintiff argues that the remainder of Dr. Roberts' records from the October 23, 2012 visit should have been considered, there is no indication that they were not. The same can be said of earlier medical records in the file. Indeed, Dr. Rubin, an independent medical reviewer, concluded that "functional impairment is supported from 2/22/13 through 5/31/2013" – that is during the time relevant to Plaintiff's claims – because, though the findings supporting that conclusion "were noted prior to the time period in question[,] it is reasonable that they would have continued during the time period in question based on the chronicity of the claimant's condition." (Doc. 34, Ex. 5 at 59). Functional impairment, however, does not automatically equate to an inability to perform any reasonable occupation, particularly those classified as sedentary; indeed, Dr. Rubin ultimately concluded that Plaintiff "could work at the occupation terms identified in the Transferrable Skills Analysis of 1/22/13 all of which are in the sedentary category . . . ." (Doc. 34, Ex. 5 at 59).

[23] When Defendant notified Plaintiff of its decision to terminate LTD benefits at the test change point, effective February 2, 2013, it included in its notification letter additional information that Plaintiff could submit for review. (Doc. 34, Ex. 5 at 3). This information included, but was not limited to, 1) "a detailed narrative report for the period 1/1/13 to present outlining the specific physical and/or mental limitations related to your condition that your doctor has placed on you as far as gainful activity is concerned, physician's prognosis, including course of treatment, frequency of visits, and specific medications prescribed;" 2) diagnostic studies conducted during the above period, such as test results, X-rays, laboratory data, and clinical findings;" 3) "any information specific to the condition(s) for which you are claiming total disability that would help [Defendant] evaluate your disability status; and any other information or documentation you think may help in reviewing your claim;" and 4) "any objective medical data you feel supports your inability to perform a sedentary occupation." *Id.* It seems that Plaintiff attempted to provide the narrative report in the form of the narrative letter dated February 1, 2013 from Dr. Janerich to Plaintiff's Counsel. Beyond that letter, Plaintiff did not provide any further information. In fact, as documented in the administrative record, Plaintiff's Counsel made clear that Plaintiff would not be submitting anything beyond the narrative letter. (*See* Doc. 24, Ex. 5 at 13 (letter from Defendant to Plaintiff's Counsel recounting a conversation in which Plaintiff's Counsel "confirmed that [he] did not have any additional information to provide for the appeal review.")).

[24] (*See* Doc. 34, Ex. 5 at 47; Doc. 34, Ex.5 at 57). Indeed, these are the records Plaintiff relies on heavily when arguing that Plaintiff continues to be disabled from any reasonable occupation. While Plaintiff has the perfect right to disagree with Defendant's medical conclusions based on the body of evidence before it, Plaintiff cannot contend that these records were not considered. "[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003), and may credit the opinions reviewing physicians over theirs. *See Eppley v. Provident Life & Acc. Ins. Co.*, 789 F.Supp.2d 546, 570–71 (E.D. Pa. April 27, 2011); *Watson v. Metro. Life Ins. Co.*, No. CIV.A.05–3481, 2007 WL 2029291, at *4 (E.D. Pa. July 11, 2007) ("[T]he fact that MetLife accorded greater weight to its reviewing physicians than to [Plaintiff]'s treating physicians does not make its decision to deny plaintiff's long-term disability benefits arbitrary and capricious.").

both concluded that Plaintiff had the capacity to perform sedentary work. There were reasonable bases for Defendant's decisions, and this Court will not disturb those decisions.

## V. CONCLUSION

Based on the foregoing, Plaintiff's Cross Motion for Summary Judgment (Doc. 35) will be deemed withdrawn and is otherwise denied and Aetna's Motion for Summary Judgment (Doc. 33) will be granted.

A separate Order follows.

Robert D. Mariani
United States District Judge